491 So.2d 581 (1986)
Regina Tisiker MARGULIES, Appellant,
v.
Martin Z. MARGULIES, Appellee.
Nos. 84-1142, 84-2006.
District Court of Appeal of Florida, Third District.
June 24, 1986.
Rehearing Denied August 5, 1986.
*582 Sams, Ward, Newman, Elser & Lovell, Cooper, Wolfe & Bolotin and Marc Cooper and Joan M. Bolotin, Miami, for appellant.
Stewart, Tilghman, Fox & Bianchi, Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin and Joel S. Perwin, Miami, for appellee.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
This appeal is from (1) a final judgment of dissolution upholding the validity of an antenuptial agreement against the wife's contention that the agreement was against public policy in several respects and that she was coerced into signing it and (2) an order awarding support for the younger child of the marriage in a vastly different amount  $15,000 per year  than that provided for the older child  $50,000 per year  in the antenuptial agreement. We affirm the final judgment of dissolution and the child support order.
Regina Tisiker and Martin Margulies met in 1978. She was a flight attendant about to be divorced from her husband; he was a very wealthy businessman. They began an intimate relationship, and by February 1979, Regina learned that she was pregnant. Regina was determined to have the child even though she and Marty[1] were not married and Marty was resisting marriage. In October of that year, a son, David, was born.
*583 During the ensuing months, Marty continued the relationship with Regina and began one with the child. In May or June 1980, Marty proposed marriage as well as an antenuptial agreement. He explained the reasons for both proposals:
"I told her I had a change of heart... . I felt that the child was mine and that I had a change of heart and that I think we should give it a try and get together and try to make it.
... .
"I wanted to be a father to my child and to give him a family life... .
"Give him my name and in order to do it I feel we should make a trial at being married. That was in my mind... .
"What was in my mind also was to protect what I worked for all my life, from a marriage that was not exactly started on the foundation that a marriage should be. That is, love and romance and that type of thing."
Whether Regina believed that the signing of the antenuptial agreement was a mandatory condition precedent to Marty's marrying her and whether Marty would have refused to marry Regina had she refused to sign the agreement are questions that were not openly discussed at or before the time of the event. There was, however, substantial competent evidence to establish that Regina, even if anxious to legitimize the child, entered into the agreement with her eyes wide open  after a complete disclosure of Marty's financial condition, negotiations through counsel resulting in modifications in the agreement, and, for all that appears and could have been found by the fact-finder, willing to forego the marriage if the agreement did not satisfy her requirements. That Regina's requirements at the time of the breakup of the marriage were allegedly far greater than they were at the time of the agreement, although perhaps understandable, gives her no ground to repudiate her agreement. The trial court's conclusion that the agreement was not coerced, the result of undue influence, or otherwise unlawfully procured is amply supported by the record.
Regina contends, however, that the agreement is void against public policy since its inadequate alimony provision had the impermissible effect of making divorce a financially painless option for Marty and since it arbitrarily reduced David's support to an inadequate amount if Regina remarried or moved from Dade County.[2]
The argument that the antenuptial agreement is against public policy because the alimony provided therein is allegedly inadequate is totally without merit. As we have already said, Regina was found to have freely entered into the agreement after full disclosure and was free to accept any amount of alimony, even an arguably inadequate amount.
The argument that it would offend against public policy to reduce a child's support merely because his mother remarried or moved her residence is, unfortunately for Regina, based on the premise that the $50,000 per year denominated as child support was in fact intended to be child support. By finding the antenuptial agreement to be fully enforceable, the trial court necessarily rejected this public policy argument. The rejection obviously stemmed from the trial court's implicit determination that the provision reducing the $50,000 "child support" to $15,000 in the event of Regina's remarriage or move was not a forfeiture of child support, but was in reality a perfectly permissible forfeiture of alimony. That implicit determination is amply supported by substantial evidence, indeed uncontradicted evidence, that the true purpose of fixing the child support sum at twice the amount of alimony was to *584 create tax benefits for Regina. The evidence reflects that this arbitrary division between alimony and child support was negotiated by Regina as a tax advantage to her and was never intended to establish either her alimony needs or David's needs for child support.
The premise upon which Regina bases her attack on the order awarding her $15,000 for the support of the second child, Michael, is again that David is receiving $50,000 in child support, and thus, the grossly disparate award for Michael (younger by two years, but in all other respects the same) is an abuse of discretion. The problem with the attack is, as we have explained, that the child support provision in the antenuptial agreement was not intended by the parties to fix David's child support needs and most assuredly should not be used as the model for, or even as any evidence of, Michael's needs. Indeed, in addition to the other evidence supporting the trial court's determination that $15,000 per annum was an adequate amount of child support for Michael, the fact that the agreement itself provided that David's child support would be reduced to $15,000 if Regina remarried or moved is powerful evidence that Regina herself believed this amount to be adequate.
While child support awards in equal amounts would likely avoid the parade of envisioned psychological horribles which, Regina contends, might result from treating siblings differently, the trial court, having implicitly found that only $15,000 of the $50,000 payment provided in the antenuptial agreement was child support, had no equalizing to do. However, even if no such finding had been made, the trial court was not compelled by any identifiable public policy to award Michael $50,000 so as to make his support equal to that provided for David in the antenuptial agreement between the parties.
Affirmed.
SCHWARTZ, Chief Judge (dissenting in part).
I agree with the majority's analysis of the issues before us and its disposition of the attack upon the antenuptial agreement.
I would reverse the child support award, however, simply because, in the light of the father's monumental standard of living and prosperity,[1] in which his children are entitled to share, $15,000 per year is so unreasonably low as to represent a clear abuse of discretion. See, e.g., Peak v. Peak, 411 So.2d 325 (Fla. 5th DCA 1982); Bordman v. Bordman, 231 So.2d 543 (Fla.3d DCA 1970).
NOTES
[1] Throughout the proceedings below, and in the briefs, the parties refer to Mr. Margulies as Marty.
[2] The specific provision in issue provided that in the event of divorce, Regina was to be paid the sum of $25,000 per year as alimony and $50,000 per year as child support of David. The alimony was to continue for a maximum period of seventeen years or until Regina died, remarried, or moved from Dade County, whichever first occurred. Also, in the event of Regina's remarriage or removal from Dade County, the child support payments were to be reduced to $15,000 per year.
[1] According to his own figures, Margulies's net worth is at least $50,000,000. The yearly child support award thus represents.03 percent of that amount.